Van Voorhis, J.
On December 31,1954 there were 13 partners in the New York City law firm of Hunt, Hill and Betts. Two estates of deceased partners were likewise interested in the firm. Thirteen seems to have been an unsatisfactory number, for three of the partners — A. V. Cherbonnier, Mahlon Dickerson and Robert McLeod Jackson (plaintiff herein) —withdrew from the firm as of that date. Agreements were made with Cherbonnier .and Dickerson under which they were to receive certain earned but uncollected fees when paid. No similar *183 agreement was made with Jackson who now sues to establish his right to participate in fees that were earned but unpaid at the time of his withdrawal, and to participate in the physical assets of the partnership. He won in the trial court, but the judgment was reversed and the complaint dismissed by the Appellate Division, First Department.
Before the trial the complaint had been dismissed at Special Term under rule 106 for insufficiency in law. This earlier judgment was reversed by the Appellate Division (2 A D 2d 971) which remanded the action for trial in a memorandum stating: “ There is sufficient ambiguity in the law partnership agreement in respect of the distributable interest of plaintiff as a retiring partner to indicate a trial rathér than a disposition of the first two causes of action on the pleading. We hold merely that there is ambiguity enough to warrant the consideration of such proof as to actual practice in the firm and other evidence in support of what was understood and acted upon by the partners.”
Thereafter the action proceeded to trial as has been stated, the trial court resolved the ambiguity in plaintiff’s favor but the Appellate Division resolved it against him by a divided court. It seems to us that the trial court was correct both on the law and on the facts. In the absence of a formal partnership agreement, upon the retirement of a partner, the firm would have to be dissolved and, when uncollected fees had been paid, they would have to be collected for the benefit of the members of the firm in liquidation. From this it follows that unless this partnership agreement established a different relationship between the partners, plaintiff, as well as Cherbonnier and Dickerson, is entitled to what he would have received on dissolution and winding up under the Partnership Law. He would not be divested of these participations by a partnership contract which was obscure or which conferred upon him similar property rights to those which he would have possessed in the absence of a formal agreement. The practical construction placed upon this partnership agreement, as disclosed by the evidence taken by the trial court, in our judgment preponderates in favor of the findings and conclusions made by the trial court.
This agreement provides that any partner may withdraw from the firm upon 90 days’ notice, unless the executive com *184 mittee of the firm causes such withdrawal to take effect before the expiration of 90 days. In event of withdrawal by any partner, section 2 of article V provides that he shall be entitled to receive
“ (b) His share of the Net Profits as determined under the provisions of Article IV Section 2 (b) as his full participating interest in the net fees of the firm; provided, however, the firm shall have the option to delay such payment, in whole or in part, for one year from the effective date of such withdrawal.”
Referring back to section 2 (par. [b]) of article IV, by which the net profits are to be determined, that part of the agreement provides as follows:
‘ ‘ Section 2. The gross fees in all matters, other than the net fees of the so-called APC cases, whether billed or unbilled, unless distribution has been made prior to the date of this amended agreement, shall accrue to the current firm and the Net Profits as defined in Article III, Section 2, shall be distributed in accordance with the Participation Schedule in effect in the year in which such fee or fees are paid, except:
“ (a) In the event of death of a Partner his estate shall receive his proportionate share of net fees in all matters pending at the time of death, whether billed or unbilled. Such payment of net fees shall be made as if the Partner had remained alive; provided, however, the individual Partners hereby specifically authorize and empower their respective distributees, executors or administrator to make an agreement with the surviving Partners for settlement at any time of all claims the estate of the deceased Partner has against the firm.
“ (b) In the event of the withdrawal of a Partner from the firm an estimate shall be promptly made of the Net Profits of the firm as of the date of such withdrawal, such estimate shall be made by Charles B. Hill and in the event that he does not act, then by the three senior Active Partners and either of such estimates shall be deemed the actual Net Profit of the firm as of the date of such withdrawal; the firm shall have the option to delay payment, in whole or in part, of any Net Profits due the withdrawing Partner for one yeár from the effective date of such withdrawal.”
Some distinction is here drawn between the procedure, at least, in event of a partner dying and what happens in the *185 case of a partner’s withdrawal from the firm. This distinction is the principal basis for plaintiff’s having been defeated at the Appellate Division. In case of the death of a partner, the interest of his estate extends to the ‘ ‘ net fees in all matters pending at the time of death, whether billed or unbilled.” Such payment of net fees is to be made as if the partner had remained alive. That signifies that the personal representatives of a deceased partner are entitled to an accounting of the total assets of the firm, including the professional fees earned but not collected, as of the time of the partner’s death.
In event of the withdrawal of a partner from the firm, an accounting of his interest in the uncollected fees is dispensed with, but in lieu thereof [1] ‘ an estimate shall be promptly made of the Net Profits of the firm as of the date of such withdrawal * * * such estimates shall be deemed the actual Net Profit of the firm as of the date of such withdrawal ’ ’.
Under this construction of the agreement, there is no distinction between what is collectible from the firm by a withdrawing partner and the estate of a deceased partner, except that it was anticipated that greater expedition would be desirable in case of a withdrawing partner so as to close out his relationship to the firm quickly to the end that he could more readily become active in another firm without the embarrassment of conflicting interests or loyalties with respect to the clients who might follow him out of the firm. This was the express interpretation of these clauses given by A. V. Cherbonnier who drew the agreement. In withdrawal the estimate is in lieu of an accounting.
The decision of the appeal hinges on whether the term ‘ ‘ net profits ”, as used in this agreement, includes fees that are earned but uncollected, or only such as shall have been collected at the time when a partner withdraws.
Net fees and net profits, as respondents’ brief says, mean exactly the same thing, except as net profits are net fees less 10% allocated to capital. There is no dispute about the capital accounts of the partners, hence this difference is unimportant for present purposes.
The net profits to be estimated as of the date of the withdrawal of a partner and paid to him under section 2 (par. [b]) of article IV and section 2 (par. [b]) of article V are described *186 in section 2 of article IV as being “ Net Profits as defined in Article III, Section 2 ”. The latter section in the agreement states: “ Section 2. At the end of each year ten percent (10%) of the net fees shall be allocated to the capital fund and the remainder shall be lmown as the Net Profits for the year.”
But in order to ascertain what is meant by ‘ ‘ net fees ’ one has to look back to section 1 of article III which says that “ The net fees in each year shall be the balance remaining ■ after all expenses incurred by the offices of the firm are subtracted from the gross fees earned by the offices of the firm for that year.”
The last words indicate that the gross fees, which determine the amount of the net fees by the deduction of expenses, are not merely such as were collected during the year but comprise fees “ earned * * * for that year.” If this is not already clear, it is demonstrated by the language of section 2 of article IV, which provides that “ The gross fees in all matters, other than the net fees of the so-called APG cases, whether billed or unbilled, unless distribution has been made prior to the date of this amended agreement, shall accrue to the current firm”. (Italics supplied.)
In other words, it is provided that unbilled gross fees accrued to the current firm while plaintiff was a member, and no other disposition is made of the uncollected earnings at the year end except that, in the case of partners remaining in the firm, such portion of the net profits as has not been collected during the year ‘ ‘ shall be distributed in accordance with the Participation Schedule in effect in the year in which such fee or fees are paid ”. The term “ net profits ” has to include more than cash collections during the current year, since otherwise there would be nothing left to be distributed in subsequent years in which the uncollected portion of such fees' are paid. It would be self-contradictory to provide, as this part of the agreement does, ■ that net profits should be distributed in accordance with the participation schedule in effect in years subsequent to the year in which they are earned, unless ex vi termini “ net profits ” included moneys earned but not collected at the close of the current year. That is, of course, the reason on account of which the value of the net profits had to be “ estimated ” in the case of a retiring partner. If the term net profits included only *187 cash paid prior to the date of withdrawal of a partner, as respondents contend, it would be a matter of computation, and there would be no occasion for the provision that an [1] ‘ estimate ’ ’ be made of the net profits as of the date of withdrawal nor for the meticulous direction that “ such estimate shall be made by Chaeles B. Hill and in the event that he does not act, then by the three senior Active Partners and either of such estimates shall be deemed the actual Net Profit of the firm as of the date of such withdrawal The purpose of an estimate of the net profits as of the date of withdrawal was to reduce to figures the amount of fees earned but not billed or collected at the time of withdrawal. Such estimate was to be in lieu of the “ actual ” net profit, which would have been definitely ascertainable by an accounting if respondents’ position were correct that only cash collected before withdrawal was to enter into the computation. The circumstance that the value of the interest of a withdrawing partner would include earned but unpaid fees evidently gave rise to the final clause in paragraph (b) that the firm should have the option to delay payment of any net profits due the withdrawing partner for one year from the date of his withdrawal. There would be no point in the delay if all that the partner were entitled to receive were to have consisted in his share of fees already collected in cash.
Construing this part of the agreement in this manner, which its draftsman testified was the manner intended, changes the pattern of the earlier partnership agreements as regards continuing partners by avoiding the necessity every year of having an accounting of the fees that were earned in previous years. This is covered by the provision that the net profits earned in previous years “ shall be distributed in accordance with the Participation Schedule in effect in the year in which such fee or fees are paid ”. But this expressly applies only to partners who do not withdraw. Instead of the ‘ ‘ referral back system ’ ’ of accounting in previous years, those portions of the net profits which have been earned but not collected are to be distributed to the continuing partners without accounting according to the Participation Schedule of the year or years in which they are collected. This would have divested plaintiff of his interest in earned but unpaid fees, after he ceased to be a partner, except for the saving clause in the case of a withdrawing partner. *188 This saving clause is contained in section 2 of article IY, which provides in addition to the above-quoted language that net profits — including earned but unpaid fees — “shall be distributed in accordance with the Participation Schedule in effect in the year in which such fee or fees are paid except ” in the case of dying or withdrawing partners (italics supplied). Under paragraph (b), as previously stated, “In the event of the withdrawal of a Partner from the firm an estimate shall be promptly made of the Net Profits of the firm as of the date of such withdrawal ’ ’. There would have been no occasion to make an estimate of the net profits if that term included only cash paid prior to the date of withdrawal of a partner, which would have made it a matter of exact computation. More significant is the circumstance that, under the verbiage of the agreement, net profits are determined by deducting expenses from gross profits, and gross profits include fees ‘ ‘ billed or unbilled ”. This demonstrates that, in directing that a withdrawing partner shall receive his share of the net profits, it was intended that, in addition to his portion of the cash collected, an estimate should be made of the value of the earned but unpaid portion of the net profits of the firm as of the date of withdrawal. Respondents’ assertion that “‘Net Profits’, under the agreement, could only mean cash net profits ” is thus at variance with the language and structure of the partnership agreement. Net profits earned in one year could not possibly be distributed in accordance with participation schedules in effect in later years in which such fees were paid, unless the term which we are attempting to define — “ net profits ” — which measures the share of a withdrawing partner, included more than current cash collections. If that were all that went to make up net profits, it would have been meaningless to provide for the disposition of such as should be collected in subsequent years.
To be sure, under this partnership agreement of 1953 (and under the 1951 agreement on which it was patterned) no formal accountings were to be necessary except to determine the shares of the estates of deceased partners. Continuing partners — unlike the result under partnership agreements prior to 1951 — are to get their shares of the net profits of earlier years according to the participation schedules in effect in the years of collection. Withdrawing partners are to receive their *189 shares on the basis of estimates of the net profits — including fees earned but unpaid[1] — as of the date of withdrawal. Since the shares of withdrawing partners would include some uncollected profits, it was provided that the firm should have the option to delay payment for a year from the date of withdrawal. The ‘ ‘ referral back system ’ ’ was abolished, under which the fees collected in each year had to be apportioned to continuing partners according to participation schedules in effect in the various prior years in which the fees were earned, but it is fallacious to assume that this signifies that the term ‘ ‘ net profits ” is comprised exclusively of cash collected in the current year, and that it was intended that a withdrawing partner should forego his proper share iri the earnings of the firm up to the time when he shall have ceased to be a partner. Such a construction nullifies the contractual definition of gross fees as including such as were ‘ ‘ billed or unbilled ’ ’, and ignores that net profits are to be computed by the deduction of the expenses of the firm from gross fees.
The special agreements between the firm and Cherbonnier and Dickerson, upon leaving the firm, are confirmatory of this interpretation of the partnership agreement. These men left the firm as of the same date as plaintiff. The object of having special agreements of severance from the firm in their cases *190 was evidently to avoid the necessity of making estimates of the value of their shares in the fees of the firm that were outstanding and uncollected. The firm assigned to Cherbonnier and Dickerson respectively, upon their withdrawals from the firm, “ all fees due from his clients, whether billed or unbilled, which fees are not reflected in the Firm’s Profit and Loss Statement of December 31, 1954.” Fifteen clients are enumerated as coming within this category in the case of Cherbonnier and 14 clients in the case of Dickerson. Manifestly, these uncollected fees assigned to Cherbonnier and Dickerson were not negligible. In turn, they transferred to the firm ‘[1] all fees whether billed or unbilled from all clients other than those listed ”. If the Appellate Division rather than Special Term were correct, these provisions in the severance agreements would be entirely gratuitous. There would have been no need for Cherbonnier or Dickerson to assign to the remaining members of the firm their interests in any fees earned but uncollected. These would have belonged to the firm anyhow under the master contract and neither of these retiring partners could have laid claim to any of them. Likewise the fees earned but unpaid from their particular clients of the firm would have belonged to the firm and the transfer of these substantial amounts to Cherbonnier and *191 Dickerson upon their withdrawal would have been a gift without consideration. It is significant that William Logan, Jr., one of the defendants, whose adverse interpretation of the partners’ agreement has been given weight by the Appellate Division, was the member of the firm who negotiated with Cherbonnier on his withdrawal. His acts in reaching this agreement with Cherbonnier could only have been based on an interpretation of the agreement opposite to that which he professed at the time when the partnership agreement was signed.
No reason is apparent on account of which plaintiff should be discriminated against, in favor of these other partners who were similarly situated and who retired at the same time, by being denied payment of his share in the uncollected fees for legal services rendered by the firm at the time of his withdrawal.
Inasmuch as the firm has declined to comply with the clause in the partnership agreement entitling appellant to an estimate of his share of the net profits of the firm as of the date of his withdrawal on December 31, 1954, an accounting is necessary in any event. Such an accounting should extend to the computation of appellant’s share in the entire net profits of the firm, whether in fees that have been paid or earned but not paid.
The judgment appealed from should be reversed and the judgment of the trial court reinstated, with costs in this court and in the Appellate Division.
Chief Judge Conway and Judges Fuld and Froessel concur with Judge Van Voorhis; Judges Desmond, Dye and Burke dissent and vote to affirm.
Judgment reversed, etc.

. The allegations in paragraphs 30 (a) and 30 (b) of the amended complaint may seem to contradict this. They are technically inconsistent with paragraph 30 (c) which immediately follows. What was intended, in the light of the language of the contract, seems to us to be clear. It is that, in making their annual settlements with respect to the distribution of earnings of the firm, the partners dealt on a cash basis. That accords with the clause in section 2 of article IV of the contract which provides that the net profits shall be distributed in accordance with the partners’ participation schedule in effect in the year when the fees are paid. That means, of course, that, insofar as their annual distributive shares are concerned, the partners are on a cash basis, and two thirds of the partners could alter the participation schedules intermediate the time when fees are earned and the time or times when they are distributed. The point is, simply, that this is not a definition of “ net fees ” or “net profits ”, but a direction that net fees or profits shall be distributed annually as collected in the year of distribution in cash. The allegations in paragraphs 30 (a) and 30 (b) of the amended complaint are correct insofar as they reflect that the partners are on an annual cash basis, but they are inartistic in speaking of that circumstance as though it presented a definition of the terms “ net fees ” or “ net profits.” A moment’s reflection discloses that the exact opposite is the meaning of these terms under the contract. It *190 would be impossible to make annual distribution from net profits in the subsequent years during which they are collected, unless net profits included fees earned but unpaid in the year in which they were earned. Otherwise to distribute net profits in a later year or years in which they are collected would be an impossibility. We are only concerned with the practice regarding annual distribution of earnings of the firm insofar as it helps to define the terms “ net fees ” and “ net profits ”, which appear to have been used with the same meaning in the case of a withdrawing partner as in the ease of partners remaining in the firm. The agreement does not say that the net profits are to be wholly distributed each year to continuing partners; it provides that such portion of the net profits as is collected" in cash shall be distributed to nonwithdrawing partners in the current year. It appears conclusively, as it seems to us, that the practice of confining annual distributions to partners to cash collected in the current year — which is alleged in paragraphs 30 (a) and 30 (b) of the amended complaint — does not militate against but requires an interpretation of “ net fees” and “net profits ”, wherever those terms are employed in the contract, as including earned but uncollected items. This is reinforced by the definition elsewhere of “ net fees ” and "net profits” as gross fees less expenses. Gross fees are described as including such as are “billed or unbilled” (art. IV, § 2).